UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v.-                                                                           1:07-CR-0375
                                                                                (LEK)

CLIFFORD PENDER *and*
SHAWNTEL HIGHTOWER,

                                        Defendants.

## **MEMORANDUM-DECISION AND ORDER[1]**

On August 22, 2007, Defendant Clifford Pender ("Defendant") was indicted, along with co-Defendant Shawntel Hightower ("co-Defendant"), of knowingly and intentionally possessing crack cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Indictment (Dkt. No. 9). Before the Court is a Motion to suppress 283 grams of crack cocaine and a significant sum of U.S. currency seized from a GMC Yukon vehicle driven by Defendant Pender on June 2, 2007. Motion (Dkt. No. 13). Defendant argues that the vehicle was stopped without at least reasonable suspicion, as required by the Fourth Amendment of the United States Constitution, and therefore items seized from the ensuing search must be suppressed. Id. The Court held a suppression hearing on March 19, 2008. Hr'g Mins. (Dkt. No. 21). For the reasons stated below, the Motion to suppress is denied.

### **I. Background**

Special Agent Ronald Arp ("SA Arp") of the Drug Enforcement Administration testified that while he was off-duty on June 2, 2007, he received a call at approximately 7:30 a.m. from a

---

[1] For printed publication by the Federal Reporters.

1

confidential informant ("CI").  Suppression Hr'g Tr. at 12 (Dkt. No. 22) (hereinafter "Tr. at __.").  SA Arp's affidavit and suppression hearing testimony differed slightly with regard to the exact contents of this tip, and this issue is considered in detail below.  See infra II.A.  Both SA Arp's affidavit and testimony, however, convey that the CI was known to him as an informant from previous dealings; that the CI told SA Arp that two individuals the CI knew, Goldie and Shawn, were in a black GMC Yukon ("Yukon") in the vicinity of McClellan Street in Schenectady, New York; that SA Arp was involved in an ongoing investigation, utilizing the CI, into whether Goldie was trafficking crack cocaine in Schenectady; and that the CI told SA Arp that Goldie had a significant amount of U.S. currency in the vehicle.  See Tr. at 12, 31; Arp Aff. at ¶¶ 3-4 (Dkt. No. 13, Attach. 3) (hereinafter "Arp Aff. at __.").

Other particulars about the events that transpired on June 2, 2007 were omitted from SA Arp's affidavit but included in SA Arp's testimony.  SA Arp testified that he spoke with the CI again by telephone at approximately 9:00 a.m.  Arp Aff. at 14.  According to SA Arp's testimony, the CI said to him that Goldie and Shawn were currently in the SUV at a U-Haul dealership in Rotterdam, New York, for the purpose of picking up a trailer for the Yukon.  Id.  Upon receiving this information, SA Arp and other law enforcement officers set up a surveillance operation in the area surrounding the U-Haul dealership.  Id.  The officers spotted a black Yukon bearing the New York license plate CKU-1294, which matched the CI's report, in the back of the U-Haul parking lot, and he saw two individuals standing next to the vehicle as a trailer was being hitched.  Id. at 14-15.  The Schenectady Police Department was called and it was arranged that a marked Schenectady Police unit would stop the Yukon when it exited the parking lot.  Id. at 15.

At approximately 9:30 a.m., uniformed Schenectady Police officers stopped the Yukon when

it left the parking lot.  Id.  The driver, Clifford Pender, and front-seat passenger, Shawntel Hightower, were removed from the vehicle and transported in a marked police car to the Schenectady Police Department.  Id. at 16, 18.  SA Arp testified that after Pender and Hightower were removed from the vehicle, he approached the vehicle and saw "a large sum of U.S. currency" lying in plain view in the center console.  Id. at 17, 28.  SA Arp testified that, accompanied by law enforcement officers tailing him in separate vehicles, he drove the Yukon to the Schenectady Police Department, where he secured the money and locked the vehicle.  Id.  The vehicle was not searched at that time.  According to SA Arp, upon Pender's arrival at the Schenectady Police Department, a parole officer involved in the investigation determined that Pender was on New York State parole, and a warrant for his arrest was issued.  Id. at 28-29.

At around 12:30 p.m., New York State Police Trooper Matt Wheeler and his K-9 arrived at the Schenectady Police Department.  Trooper Wheeler testified that the K-9, named Kane, is trained to detect odors for cocaine, marijuana, heroin, methamphetamine, and LSD.  Id. at 36.  While he was waiting for Special Agent Arp to arrive, Trooper Wheeler testified that he took Kane for a walk and while passing an SUV in the parking lot, Kane alerted at the rear taillight.  Id. at 39.  At that point, Trooper Wheeler was unaware of which car he would be directed to search.  Id.  SA Arp arrived shortly thereafter and asked him to conduct a dog sniff of two vehicles in the parking lot, one of which was the Yukon.  Id. at 40-41.  Using their usual process, Trooper Wheeler directed Kane to sniff the Yukon, which was the same vehicle Kane had alerted on earlier, and Kane again alerted on the driver's side rear taillight.  Id. at 21, 41-42.  SA Arp, who was present, then removed the taillight screws and taillight and observed a large quantity of crack cocaine in the wheel well.  Id. at 21, 42.  The dog then searched the inside of the vehicle.  Id. at 42.

## II. Discussion

### A. Credibility Assessment

The Court must begin by considering the significance of the fact that SA Arp omitted a few details from his affidavit that were revealed in his testimony. Furthermore, the Court must consider the significance to be afforded to the fact that SA Arp included information about a communication with a second confidential informant ("CI-2") in his affidavit without making clear when that communication occurred, and SA Arp subsequently testified that this communication occurred after Defendant and co-Defendant were arrested. See Arp Aff. at ¶ 6; Tr. at 27. Defendant argues that these issues discredit the factual assertions underlying the Government's argument that the officers did not violate Defendant's Fourth Amendment rights. See Def.'s Reply at 2-5 (Dkt. No. 25).

Indeed, at the time the suppression hearing was ordered, the Court had within its knowledge barely enough information to conclude that the stop of Defendant's vehicle may have complied with the Fourth Amendment. Agent Arp's affidavit leaves significant questions because it lacks significant legally relevant factual details and, standing alone, does not create an entirely coherent narrative. See Arp Aff. ¶¶ 4-5. By contrast, on its own, SA Arp's testimony stands as a persuasive description of the events that took place leading up to the arrest of Defendant and co-Defendant and the search of the Yukon. If the testimony aligned perfectly with SA Arp's affidavit, the Court would easily find that there was probable cause. As Defendant points out, however, SA Arp's affidavit and subsequent detailed testimony at the suppression hearing differ in a few ways that require the Court's careful scrutiny and a determination about which factual assertions to rely on in determining whether Defendant's Fourth Amendment rights were violated on June 2, 2007. See Def.'s Mem.at 9-11 (Dkt. No. 23); Def.'s Reply at 2-4 (Dkt. No. 25).

The first difference between SA Arp's affidavit and testimony is that the affidavit includes the following paragraph:

> On June 2, 2007, your deponent learned from another source of information that two individuals meeting the physical description of Pender and Hightower had been observed in the early morning hours of June 2, 2007 looking for [Damen Wilson]. This source of information also described [Damen Wilson] as upset that he had 'missed his connect,' further indicating that Pender and Hightower intended to distribute the afore-described crack cocaine.

Arp Aff. at ¶ 6. The affidavit does not state the time on June 2, 2007, relative to the other events occurring on the same day, that he received the tip from CI-2. At the hearing, SA Arp did not mention the second confidential informant in his direct testimony. Upon cross-examination, SA Arp testified that he received this information from CI-2 after the vehicle was stopped. Tr. at 27. Therefore, this statement in the affidavit is not inconsistent with SA Arp's testimony about the events preceding law enforcement's stopping of the Yukon. Because SA Arp testified that he did not receive the tip from CI-2 until after the Yukon was stopped, the tip from CI-2 is not relevant to the determination of whether law enforcement had probable cause or reasonable suspicion to make the stop. As a result, the fact that SA Arp did not testify about CI-2 on direct examination does not, by itself, weigh against the Government in the Court's consideration of the present Motion.

Nevertheless, the aforementioned paragraph of the affidavit does require further attention due to the remaining difference between SA Arp's affidavit and testimony. In his affidavit, SA Arp stated that the CI had contacted him on the morning of June 2, 2007 and reported that he "had seen 'Goldie' driving a dark colored 'Yukon' type vehicle in the vicinity of McClellan Street in Schenectady, New York. 'Goldie' was reported to me by [the CI] as having been in possession of a large amount of U.S. currency." Arp Aff. at ¶ 4. This statement in the affidavit does not include an

5

additional detail SA Arp stated in his testimony, which is that the CI also said that he "was told that Goldie just missed getting a connection or meeting with Damen Wilson to drop off a large sum of narcotics." Tr. at 12. These two statements about what the CI told him do not contradict each other. However, the omission from SA Arp's affidavit of the details he stated in his testimony, that the CI told him about narcotics in the vehicle and the missed connection, gives the Court pause before crediting Agent Arp's testimony because of the fact that SA Arp used this same language to describe the tip he received from CI-2 after the vehicle was stopped.

      Defendant argues that the Court should entirely discredit SA Arp's hearing testimony, including the assertion that the CI reported to him that Goldie had narcotics in his possession and had missed a connection with Wilson. Def.'s Mem. at 7, 9-13 (Dkt. No. 23). However, these two statements are clearly consistent and the omitted detail in this section of the affidavit is consistent with the rest of the affidavit, which is equally lacking in material details. Furthermore, the fact that CI and CI-2 relayed similar information to SA Arp, using similar words, does not require an inference that SA Arp was mistaken in his testimony about whether the CI told him about the presence of narcotics and the missed connection prior to stopping the Yukon. This is because, according to SA Arp's testimony, both CI and CI-2 reported to him that they heard Goldie say those things. Given that the other information that SA Arp received from CI and CI-2 on June 2, 2007 was so similar, the Court does not find it difficult to believe that each confidential informant heard Goldie say those things and subsequently told SA Arp. Therefore, while the omission from SA Arp's affidavit of this single detail of the CI's tip weighs against the Government to some extent, it is not enough to convince the Court of Defendant's hypothesis that SA Arp must have learned about the presence of narcotics and the missed connection only from CI-2 and only after stopping the

Yukon.

Defendant also argues that the Court should not credit SA Arp's testimony that he received the information about a missed connection before the vehicle was stopped because, according to Defendant, if SA had already received this tip, he would have searched the vehicle at the scene rather than waiting for a K-9 search. Def.'s Mem. at 7, 13 (Dkt. No. 23). Such an inference is not warranted; another entirely reasonable possibility is that an officer would decide to first utilize a dog sniff in a situation where, as here, the suspected contraband was narcotics; none was visible in plain view; the vehicle was being impounded in any event due to arrests; and the officer was engaged in an ongoing operation. Tr. at 19. There are many lawful reasons that may have motivated SA Arp's decision not to search the Yukon immediately; the Court will not become mired in speculation about SA Arp's motives. Defendant's hypothesis simply is not enough to convince the Court that SA Arp's omission of an important detail from his affidavit requires the Court to negate otherwise credible and uncontradicted testimony about the events of June 2, 2007. Ultimately, SA Arp's detailed testimony presented at the suppression hearing was convincing and, in the absence of anything other than speculation, the Court concludes that this information should be considered in an assessment of whether Defendant's Fourth Amendment rights were violated.

## B. Probable Cause to Stop the Yukon

Defendant argues that law enforcement lacked reasonable suspicion or probable cause to stop the Yukon as it exited the U-Haul facility on June 2, 2007. See Def.'s Mem. at 6 (Dkt. No. 23). The Government asserts that the information conveyed by the CI to SA Arp on the morning of June 2, 2007, in light of SA Arp's prior interactions with the CI, provided probable cause to believe that Defendant was in the process of committing the crimes of conspiracy to distribute and possess with

7

the intent to distribute crack cocaine.  See Gov.'s Response at 6-7 (Dkt. No. 24).

"A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause."  Maryland v. Pringle, 540 U.S. 366, 370 (2003).  "Probable cause to arrest depends upon whether, at the moment the arrest was made . . . the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the (suspect) had committed or was committing an offense."  Adams v. Williams, 407 U.S. 143, 148 (1972) (internal quotation marks omitted).  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  Id. at 149.  In describing the probable cause standard, the Supreme Court stated, "it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."  Gates, 462 U.S. at 235 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  A court determines the existence of probable cause by examining the "totality-of-the-circumstances" known to law enforcement at the moment of the search or seizure being challenged.  Gates, 462 U.S. at 230.

Likewise, when the existence of probable cause is alleged to rest in part on an informant's tip, a court must engage in a "totality-of-the-circumstances" analysis.  Gates, 462 U.S. at 230.  In Illinois v. Gates, 462 U.S. 213, 230 (1983), the Supreme Court stated,

> an informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of his report.  We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case . . . . [T]hey should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" . . . .

See also U.S. v. Elmore, 482 F.3d 172, 179 (2d Cir. 2007) ("[T]he informant's 'basis of knowledge' and 'veracity' (*i.e.,* how he knows and why we should believe him) remain highly relevant to a determination of either probable cause or reasonable suspicion."). Explaining Gates, the Second Circuit explained that "[i]nformation about criminal activity provided by a single complainant can establish probable cause when that information is sufficiently reliable and corroborated." Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994) (citing U.S. v. Wagner, 989 F.2d 69 (2d Cir. 1993)).

     In the instant case, SA Arp testified at the suppression hearing that, as part of an ongoing months-long investigation into the trafficking of cocaine and crack cocaine by an individual named Damen Wilson, he had spoken with and received intelligence from this CI prior to June 2, 2007. Tr. at 9-10. Specifically, SA Arp stated that in early April 2007, the CI told him that Damen Wilson was trafficking large amounts of cocaine and crack cocaine in Schenectady, New York, and that Wilson was receiving the narcotics from an individual who the CI knew only as Goldie. Tr. at 9-10. SA Arp testified that he had utilized this CI in a controlled purchase of two ounces of crack cocaine from Wilson on April 30, 2007. Tr. at 10. Furthermore, SA Arp testified that on June 2, 2007, he was aware of other instances in which this CI had been involved with similar controlled purchases for another special agent involved in the same investigation, and had also provided accurate intelligence leading to a Title III warrant. Tr. at 5, 7-11, 22-23.

     Accordingly, the CI had proved reliable in the past, and his veracity had been established because SA Arp had utilized the CI in a controlled purchase of crack cocaine from Wilson on April 30, 2007. See, e.g., U.S. v. Sidwell, 440 F.3d 865, 869 (7th Cir. 2006) (upholding probable cause for a warrant because "we ultimately find persuasive the fact that the informant had completed numerous other controlled buys in the past and provided, on those occasions, accurate and reliable

information."). SA Arp had reason to believe that the information provided by the CI on June 2, 2007 was accurate because it was consistent with the information provided earlier in 2007 by this CI, a substantial portion of which SA Arp had corroborated in the course of the ongoing investigation. Also significant to establishing probable cause is that, according to SA Arp, the CI told him that his basis for knowing Goldie had a large amount of narcotics in his possession and was waiting at Wilson's house to drop off narcotics was that Goldie had told him this information. Tr. at 12-13. Given all of this information within SA Arp's knowledge on June 2, 2007, SA Arp was reasonable in believing that the information the CI provided on June 2, 2007 was accurate, and thus, that a felony was being committed by the individuals fulfilling the description provided.

It is clear that "even in making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." Gates, 462 U.S. at 242 (internal quotation marks omitted); see also U.S. v. Cantu, 519 F.2d 494, 497 (7th Cir. 1975) (discussing the accrual of probable cause based on an informant's tip). Furthermore, probable cause may exist based on an officer's verification of significant portions of an informant's tip, even if none of those verified portions involve illegal activities. See Gates, 462 U.S. at 245 n.13 ("innocent behavior frequently will provide the basis for a showing of probable cause"). In this instance, the CI's account was corroborated by law enforcement officials, and probable cause accrued, when officers saw two men standing alongside the black SUV that displayed the vehicle registration number provided by the confidential informant, as a trailer was being hitched in the parking lot of the U-Haul facility in Rotterdam. Tr. at 15.

**B. Probable Cause to Search The Yukon**

Defendant argues that even if law enforcement had probable cause to arrest Defendant, there was not probable cause to search the vehicle. Def.'s Mem. at 12 (Dkt. No. 23). The Government asserts that the information the CI told SA Arp on the morning of June 2, 2007, concerning the presence of narcotics and a large sum of cash in the vehicle, provided probable cause for a warrantless search of the Yukon. Gov.'s Response at 7 (Dkt. No. 24).

Under the automobile exception to the Fourth Amendment's warrant requirement, the warrantless search of an automobile is constitutional so long as the officers have probable cause to believe that the vehicle contains contraband. See Maryland v. Dyson, 527 U.S. 465, 466-467 (1999) (per curiam); Michigan v. Thomas, 458 U.S. 259, 262 (1982) ("[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.") (discussing Chambers v. Maroney, 399 U.S. 42, 90 (1970)).

As discussed *supra*, the confidential informant's tip combined with the corroboration of significant details of the tip by law enforcement provided probable cause to believe that Defendant and co-Defendant possessed a significant amount of narcotics in the Yukon at the time the vehicle was stopped. Based on law enforcement's information at the time of the stop, there was probable cause to search the vehicle pursuant to the automobile exception to the warrant requirement. In addition, SA Arp testified that he saw a large quantity of U.S. currency in plain view in the center console of the vehicle after Defendants were removed from the Yukon and before the search was conducted, which supported the CI's tip that he saw Goldie counting a large sum of money in the vehicle earlier that same morning. See Tr. at 31. This observation provided additional reason to

credit the remaining unverified portion of the CI's tip that the vehicle contained a large quantity of narcotics. For these reasons, the search of the Yukon and the seizure of evidence contained therein was lawful.

### III. Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendant's Motion to suppress (Dkt. No. 13) is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.

DATED:    May 15, 2008
          Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge